# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 2:08-cr-306-KJD-GWF |
| vs. | **FINDINGS & RECOMMENDATIONS** |
| CHRISTOPHER SMITH, | **Re:  Motion to Suppress (#16)** |
| Defendant. | |

This matter is before the Court on Defendant's Motion to Suppress (#16), filed on January 8, 2009; the Government's Response in Opposition to Defendant's Motion to Suppress (#20), filed on January 30, 2009; and the Defendant's Reply to Government's Response (#21), filed on February 11, 2009. The Court conducted an evidentiary hearing on April 1, 2009. Following the hearing, the parties submitted supplemental briefs. The Government filed its Supplemental Brief (#41) on April 8, 2009 and Defendant filed his Supplemental Brief (#44) on April 20, 2009. Defendant filed a further Supplemental Brief (#45) on April 28, 2009.

On April 27, 2007, Defendant Christopher Smith was stopped and detained by North Las Vegas Police Officers Shaun Bryan and Robert Knickerbocker on the premises of the Buena Vista Springs Apartments for possessing an open container of alcoholic beverage in violation of North Las Vegas Municipal Code Section 9.08.040. While the officers were questioning the Defendant, they observed a large bulge in Defendant's right waistband. The officers conducted a pat down search of Defendant which resulted in the discovery of a short barrel .22 caliber rifle. Mr. Smith was subsequently charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and §924(a)(2).

*Second Superceding Criminal Indictment (#31)*, filed on March 24, 2009.[1]  Defendant argues that the officers lacked probable cause or reasonable suspicion to stop and detain him and, therefore, the evidence seized during the detention was obtained in violation of the Fourth Amendment.

## FACTUAL BACKGROUND

The Buena Vista Springs Apartments is a large apartment complex located in North Las Vegas, Nevada.  The complex is bounded on the north and south by Cartier and Carey Avenues and on the east and west by Martin Luther King Boulevard and West Street.  *See Defendant's Exhibit "D"* (aerial photograph of complex).  There appear to be in excess of 50 apartment buildings in the complex.  A street known as Morton Avenue runs roughly north-south through the middle the apartment complex.  A side street known as McDonald Court, runs west from Morton Avenue and ends in a cul-de-sac.  *Id.* These interior streets were vacated and reconveyed by the City of North Las Vegas to the property owner in 2000.  *Defendant's Exhibit "A."*  Thus, they are not publicly owned streets.  There are other undesignated streets, alleys and parking lots interspersed throughout the complex.  *Defendant's Exhibit "D."*  Many of these streets, alleys or parking lots are accessible directly from the exterior public streets, Carey, West, Cartier and Martin Luther King.  Other interior parking lots and streets are accessible from Morton Avenue and McDonald Court.  *Id.*

The apartment complex is surrounded on all four sides by a wrought iron or metal fence. Officers Bryan and Knickerbocker testified that there are numerous openings in the fence on all four sides of the complex which permit vehicles to enter the interior streets, alleys or parking lots or allow pedestrians to enter the complex.  Although there are gates at these locations, the officers testified that during the time they patrolled the complex, these gates were always open.  The one exception to this is a gate near the northeast corner of the complex where an interior east-west street, Helen Avenue, intersects with Martin Luther King Boulevard.  *See Defendant's Exhibit "D."*  The officers testified that the gate at Helen Avenue is kept closed but can be opened electronically by police or other emergency vehicles.  A guard shack or booth is located on  Morton Avenue at the entrance into the complex from Carey Avenue.

---

[1] Count Two of the Superceding Indictment charges that Defendant was in possession of a firearm and ammunition on November 15, 2008.  That charge is not the subject of Defendant's motion to suppress.

*See Exhibits "D"* and *"E."* Officers Bryan and Knickerbocker testified that the guard shack was not manned and vehicles were not stopped or precluded from entering the complex at that location.

In 2005, the Buena Vista Apartments management granted the North Las Vegas Police Department authorization "to trespass any person or persons not on the lease or does not possess a valid visitors pas (sic) on the properties . . ." *Government Exhibit "2."* Officer Bryan testified that the Buena Vista Springs Apartments experiences a high level of gang activity.  He also testified that a police department substation is actually located on the apartment complex premises.  The apartment management maintains a current trespass letter or list of persons who have been trespassed from the premises.  The police officers conduct frequent "property checks" on the premises, i.e. they patrol the property.  Officer Bryan testified that officers conduct "consensual stops" of anyone found on the premises whom the officers do not recognize as tenants or authorized visitors.  If a person is not a resident of the complex or does not have a visitor pass, and appears to be a problem on the property, the officers will add him or her to the trespass list and remove the person from the property.  If a previously trespassed person is found on the premises, they are either arrested or removed from the premises. Officer Bryan testified that the officers attempt to make contact with and identify everyone that they see in the complex.

Officer Bryan testified that he and Officer Knickerbocker were conducting a property check at the Buena Vista Apartments on April 27, 2007 at approximately 8:20 p.m.  They were near the southeast corner of the apartment building located at 1705 W. McDonald Court (hereinafter "Building 1705") which is in the southern portion of the complex.  There is a parking lot between the north side of this building and the interior street known as McDonald Court.  *See Defendant's Exhibit "D"* and *Government's Exhibit "1"* (aerial photographs). Officer Bryan testified that he first observed Defendant Smith walking south on McDonald Court toward the parking lot located on the north side of Building 1705.  Officer Bryan stated that Defendant had an open 24 ounce can of beer in his hand.  He did not actually observe the beer can, however, before Defendant entered the parking lot. Officer Bryan testified that he walked around the south side of Building 1705 to its northwest corner to cut-off Defendant's route of travel across the parking lot, while Officer Knickerbocker approached Defendant in the parking lot.  Officer Knickerbocker testified that he first observed Defendant in the parking lot in front of

1  Building 1705.

2        According to Officers Bryan and Knickerbocker, they stopped and detained Defendant based on
3  his possession of the open container of alcoholic beverage.  Officer Knickerbocker asked Defendant if he
4  resided in the apartment complex, if he had identification and why he was on the property.  In response
5  to Officer Knickerbocker's question, Defendant pointed to an apartment in Building 1709 which is
6  located on the west side of Building 1705.  *See Government's Exhibit "1."*  Officer Knickerbocker asked
7  Defendant if he was "on the lease."  Defendant responded no and stated that he was visiting his people.
8  Approximately 2-3 minutes after Defendant was initially detained, and while Officer Knickerbocker was
9  still questioning him, Officer Bryan noticed a bulge on the right side of Defendant's waistline.  Officer
10 Bryan asked Defendant if he had any weapons on him.  Defendant did not respond.  Officer Bryan again
11 asked Defendant if he had any weapons and Defendant again did not answer.  Officer Bryan also
12 testified that Defendant backed away somewhat from the officers.  At that point, both officers grabbed
13 and physically restrained the Defendant.  Officer Bryan performed a pat down search and felt what
14 appeared to be a weapon on Defendant's right side where he had seen the bulge.  He immediately placed
15 Defendant in handcuffs and removed a short barrel .22 caliber rifle from Defendant's person.  Officer
16 Bryan testified that Defendant was placed under arrest for the open container violation.  The officers
17 conducted a further search of Defendant incident to arrest, but found no other weapons or contraband.
18 Defendant was taken to the police substation on the premises.  A records check was obtained on
19 Defendant which revealed that he had prior felony convictions.

20       Officer Bryan testified that it was, and is, his understanding that the North Las Vegas Municipal
21 Code Section 9.08.040 prohibits a person from having an open container of alcoholic beverage in any
22 place where the public has access, whether it be a street, parking lot, alleyway or sidewalk.  He believed
23 that Defendant Smith violated this ordinance on April 27, 2007 by having an open container of beer in
24 the parking lot on the premises of the Buena Vista Springs Apartments.  Officer Knickerbocker testified
25 that Defendant Smith was stopped and detained because the officers observed him in possession of an
26 open container of alcoholic beverage in the parking lot in the apartment complex.  Officer
27 Knickerbocker confirmed that the bulge in Defendant's pants was observed by Officer Bryan after the
28 officers had stopped and detained Defendant for the "open container" violation.

4

## DISCUSSION

**1. Whether Defendant's Possession of an Open Container of Alcoholic Beverage in the Apartment Complex Parking Lot Violated the City Ordinance.**

Police officers may stop and detain an individual when they have reasonable suspicion or probable cause to believe that the person has committed a crime. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007), citing *Michigan v. Summers,* 452 U.S. 692, 700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Police officers have probable cause to arrest when a person commits a misdemeanor crime in their presence. *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536 (2001). In this case, Officers Bryan and Knickerbocker stopped and detained Defendant Smith based on their belief that he was violating the City of North Las Vegas' "open container" ordinance. The first issue, therefore, is whether Defendant was in possession of an open container of alcoholic beverage in an area prohibited by city law such that the officers had reasonable suspicion or probable cause to stop and detain him.

Section 9.08.040 of the North Las Vegas Municipal Code states as follows:

> The drinking of any intoxicating liquor or any fermented malt beverage or the possession of any open container which contains an intoxicating liquor or fermented malt beverage is unlawful in the following places:
>
> A. On any street, roadway, boulevard, alley, parking lot or sidewalk in the city.
>
> B. On the property or premises of the establishment from which the closed container of liquor, beer or wine was purchased.

Section 9.08.040. does not expressly use the words "public" or "private" to explain or modify the places described in subparagraph A. Chapter 9.08 of the Municipal Code, however, is entitled "Offenses Against Public Peace and Decency" which implies some public component to the sections contained in that chapter. The Government also argues that Section 9.08.040 should be construed consistent with the definition of "Public parking area" set forth in Chapter 17 of the Municipal Code which governs zoning matters. Section 17.12.020 states:

> "Public parking area" means an open area, other than a street or alley designated for use, or used, as temporary parking for vehicles when available for public use, whether free or for compensation or as an accommodation for clients or customers.

. . .

. . .

Defendant argues that this definition in a different chapter dealing with zoning laws has no binding effect on the construction of provisions in Chapter 9 of the Code. The definition, however, appears to be consistent with Defendant's argument that the "open container" ordinance should be limited to conduct occurring in the "public arena" rather than in private locations. *Defendant's Reply (#21)*, p. 3:10-11.

State court decisions from other jurisdictions have construed "open container" ordinances and driving under the influence ("DUI") laws in regard to whether they apply to conduct on privately owned parking lots. In *State v. Schmitt*, 171 P.3d 259 (Idaho App. 2007), a city ordinance provided that any person who is in possession of an open container of beer within the city shall be guilty of a misdemeanor, except "within a fully enclosed, privately-owned building or upon a private parking lot adjacent or appurtenant to such building . . . ." While investigating suspicious activity at a warehouse, police officers saw the defendant exit the warehouse and enter the adjacent parking lot while holding an open can of beer. The officers detained defendant at gunpoint and subsequently discovered illegal drugs on his person. The trial court denied defendant's motion to suppress this evidence on the grounds that the police officers had probable cause to arrest defendant for violating the city's open container ordinance. In affirming, the Idaho Court of Appeals noted that in a previous case involving Idaho's DUI statute, it was persuaded by the Connecticut Supreme Court's statement in *State v. Boucher*, 541 A.2d 865, 867-68 (Conn. 1988) that a "public" parking lot is any parking lot to which the general public has access. *Schmitt*, 171 P.3d at 262. In discussing its previous decision, the court also stated:

> We held that for an area to be open to general public use, it was not necessary that the area be open to everybody all of the time. (internal citation omitted). Instead, a place is open to the public when the indefinite public, rather than a predetermined group of individuals, is invited, either expressly or by implication to enter the property for any reason. In affirming the defendant's judgment of conviction, we noted that the bar parking lot, while private property, was not restricted by any physical barriers or had any posted signs controlling access. Rather, any member of the public who wanted to patronize the bar could come onto the property.

*Id.* at 262.

*Schmitt* further noted that the open container ordinance, at issue, made a clear distinction between a "privately owned" building and a "private" parking lot. The use of the word "private" in the ordinance was not synonymous with "privately-owned." The court further noted that the common,

6

relevant definition of "private" is "not freely available to the public." *Schmitt* at 262, quoting Webster's Third New International Dictionary 1805 (1993). In holding that the parking lot was not private, the court relied on the fact that the parking lot was not fenced in, had no signs indicating that it was not open to the public, and was immediately accessible from the public sidewalk and street. There was also testimony that during the day the parking lot was frequently full of vehicles and was the only apparent way to access the building's public, business entrance. *Id.* at 263.

In *People v. Krohn*, 149 Cal.App.4th 1294, 58 Cal.Rptr.3d 60 (2007), a city ordinance made it "unlawful for any person to drink any alcoholic beverage on any ... public place ... in the City...." A police officer detained the defendant inside a gated apartment complex after observing him walking down a stairway to a parking area with an open can of beer. The apartment complex was surrounded by a fence and there were locked gates at the front and rear entrances. Access to the parking area was also controlled by an electronic gate. There was evidence that the front gate was occasionally propped open to prevent it from closing and automatically locking. In holding that the officer did not have probable cause or reasonable suspicion to detain defendant for violating the ordinance, the court stated that "public place" generally means "a location readily accessible to all those who wish to go there . . . ." *Id.* 58 Cal.Rptr. at 63. The key consideration is whether a member of the public can access the place "without challenge." The court stated that a location guarded by a fence or locked door or gate is not readily accessible to the public, and is not a public place. The court further held that the fact that the front gate was periodically propped open did not detract from the conclusion that the location was private as opposed to public. An unpublished decision, *People v. Davis,* 2009 WL 1037711 (Cal.App. 4 Dist. 2009), recently distinguished *Krohn* in holding that the courtyard of an apartment complex was a public place because it was unfenced and immediately accessible from the public street and sidewalk.

In *State v. Boucher*, 541 A.2d 865 (Conn. 1988), the defendant was charged with driving under the influence after he was observed in a parking lot of a Midas Muffler Shop. The state conceded that the use of the parking lot was restricted to Midas customers. In upholding the dismissal of the DUI charge by the trial court, the intermediate appellate court had also relied on arguable evidence that there were signs posted in the parking lot which informed the public that vehicles of non-customers were subject to being towed at the owners' expense. The Connecticut Supreme Court reversed and held that

1  regardless of such signs, the parking lot was a public parking lot within the meaning of the DUI statute.
2  In so holding, the court stated that the essential feature of a public use is that it is not confined to
3  privileged individuals or groups whose fitness or eligibility is gauged by some predetermined criteria,
4  but rather is open to the indefinite public.  It is the indefiniteness or unrestricted quality of potential users
5  that give a use its public character.  The court concluded that the parking lot was public because the
6  Midas store implicitly invited the public onto its premises to do business with it.  The fact that the store
7  may have intended the parking lot to be restricted to use by its potential customers did not deprive it of
8  its public characteristic.

9  Defendant has cited *United States v. Sanders*, 954 F.2d 277 (4th Cir. 1992), in support of his
10  motion to suppress.  In *Sanders*, the police suspected that defendant had committed an armed robbery.
11  Police officers staked out defendant's car which was parked in his apartment complex parking lot.  A
12  detective instructed the officers to stop defendant if he attempted to drive away.  The officers observed
13  defendant move his vehicle from one parking space to another in the parking lot.  The officers ostensibly
14  stopped and detained defendant because his vehicle had an expired license plate tag which violated state
15  statutes requiring vehicles be registered and licensed in order to lawfully operate upon a highway.
16  Defendant was arrested and given *Miranda* warnings after which he confessed to the robbery.  In holding
17  that defendant's confession should be suppressed, the Fourth Circuit held that it resulted from an
18  unlawful stop and arrest in violation of the Fourth Amendment.  The court rejected the government's
19  argument that the police had jurisdiction to enforce traffic laws in the apartment parking lot based on a
20  statute that provided that traffic laws applied to parking lots that are open to the public so long as signs
21  are posted to inform the public that the area is subject to police jurisdiction.  In refusing to recognize the
22  statute as justifying defendant's detention and arrest, the court noted that the government raised the
23  statute for the first time on appeal.  Secondly, there was no evidence that the parking lot was open to use
24  by the public or that it had ever been posted with the signs required by the statute.  *Sanders* is of little
25  relevance to this case because it concerned a materially different type of statute and there was simply no
26  evidence whether the parking lot was or was not open to the public.

27  The Court concludes that Section 9.08.040 of the North Las Vegas Municipal Code should be
28  construed in a manner consistent with cases such as *Schmitt*, *Krohn* and *Boucher, supra*.  Under this

1  construction, the prohibition against possession of an open container of alcoholic beverage in a parking
2  lot is limited to parking lots that are open and accessible to the public regardless of whether they are
3  located on private or public property. This construction of the ordinance is also consistent with the
4  definition of "public parking area" in the Municipal Code chapter governing zoning.

5        The "public" or "private" nature of the parking lot in this case is not, however, as clear as was the
6  case in *State v. Schmitt* or *People v. Krohn* where the facts clearly favored a finding in one direction or
7  the other. The fact that the Buena Vista Springs apartment complex is fenced on all four sides tends to
8  support a finding that it is not open to the public. There are numerous openings in the fence, however,
9  that permit vehicles or pedestrians to enter unrestricted into the apartment complex. With one exception,
10 the gates at these locations were always open. This, of course, weighs in favor of finding pubic access.
11 The presence of the guard shack on Morton Avenue suggests that entry into the complex is controlled.
12 The officers testified, however, that this guard shack has never been manned during the period they have
13 patrolled the apartment complex. No evidence was presented that there are any signs posted on the
14 premises indicating that public access is prohibited or restricted, or that trespassers will be removed or
15 arrested.

16       The apartment complex is frequently patrolled by police officers who make contact with any
17 persons on the property whom they do not recognize as tenants or authorized visitors. If officers
18 encounter a person who is not a resident or does not have a visitor pass, and who appears to be a
19 problem, then the person will be added to the trespass list and removed from the property. Although
20 there was and is a substantial daily police presence in the apartment complex, including a police
21 substation on the premises, it was not clear from Officer Bryan's and Officer Knickerbocker's testimony
22 whether this police presence is so pervasive that persons entering the apartment complex would
23 generally perceive it as restricted, private property. The presence of police officers on the property
24 might also tend to suggest the contrary -- that the complex is public and not private property.

25       The Court concludes, on balance, that the parking lot in which Defendant was stopped for the
26 open container violation was a "public" parking lot within the scope of Section 9.08.040. The Court
27 bases this conclusion on the fact that the parking areas within the apartment complex, including the
28 parking lot in which Defendant was arrested, are generally accessible to the public who can enter the

complex from the surrounding public streets at numerous open and unrestricted entrances. In addition, there was no evidence that any signs were posted on the property advising that it is private property or that public access is prohibited. In so holding, the Court recognizes that there are other facts, as discussed above, which could support a contrary conclusion.

**2. Assuming that the Parking Lot Was Not Within the Scope of the Open Container Ordinance, Did the Officers Make a Mistake of Law or Fact in Stopping and Detaining Defendant?**

Assuming that the parking lot is not a "public" parking area to which the ordinance legally applies, then the next issue is whether the officers' error in stopping and detaining Defendant resulted from a mistake of law which requires suppression of the evidence, or from a mistake of fact which does not require suppression if the officers' belief that Defendant violated the law was objectively reasonable.

In *United v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000), the Ninth Circuit stated that a belief based on a mistaken understanding of the law cannot constitute the reasonable suspicion required for a constitutional traffic stop because the legal justification for the traffic stop must be objectively grounded. The court held that there is no "good faith" exception for a "mistake of law." The Ninth Circuit has also stated, however, that "'[a] mere mistake of fact will not render a stop illegal, if the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot.'" An officer's correct understanding of the law, together with a good-faith error regarding the facts, can establish reasonable suspicion. *United States v. Miguel*, 368 F.3d 1150, 1153-54 (9th Cir. 2004), quoting *United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002) and *United States v. King*, 244 F.3d 736, 739 (9th Cir. 2001). The distinction between a mistake of law and a mistake of fact is therefore crucial in determining whether reasonable suspicion exists to justify a stop. *Twilley*, 222 F.3d at 1097 n.1.

In *Twilley*, a California statute required cars to display every license plate issued by California or any other jurisdiction in the United States. The officer stopped defendant's vehicle in the mistaken belief that Michigan required vehicles registered in that state to display two license plates. Michigan, however, only required one license plate. In holding that the stop violated the Fourth Amendment, the court distinguished *United States v. Geelan*, 509 F.2d 737 (8th Cir. 1974), which upheld the constitutionality of a traffic stop where the officer mistakenly believed a car bearing a single license plate was from a state which required two plates. The officer in *Geelen* did not realize until after

1  stopping the vehicle that it was from a state which he knew required only one plate.  The officer in
2  *Twilley,* however, was not mistaken regarding the state in which vehicle was registered.  He was instead
3  mistaken about the requirements of Michigan's license plate law.  Thus, the officer's mistake was one of
4  law which required suppression regardless of the officer's possible good faith.  In *United States v. King*,
5  244 F.3d 736 (9th Cir. 2001), the court followed *Twilley* in holding that an officer made a mistake of law
6  when he stopped defendant's vehicle for having a disabled parking placard hanging from the rear-view
7  mirror.  The law prohibited driving a motor vehicle which has a sign, poster or other nontransparent
8  material *upon* the front windshield in a manner that materially obstructs the driver's clear view of the
9  street.  The court held that the statute did not apply to parking placards that hang from the rear view
10 mirror because they were not *upon* the windshield.  The court therefore held that the officer's decision to
11 stop the vehicle violated the Fourth Amendment.
12         By contrast, in *United States v. Dorais*, 241 F.3d 1124, 1130-31 (9th Cir.2001) and *United States*
13 *v. Miguel*, 368 F.3d 1150, 1153-54 (9th Cir. 2004), the court found that the officers committed excusable
14 mistakes of fact in stopping and detaining the defendants for alleged violations of law.  In *Dorais*, a
15 Hawaii statute made it a misdemeanor to keep a rental car more than 48 hours after it is due to be
16 returned.  The officer stopped the rental vehicle operated by defendant based on incorrect information
17 that the vehicle was overdue when, in fact, the 48 hours had not yet expired.  The court held that the
18 officer was entitled to rely in good faith on the erroneous information provided by the rental agency and
19 therefore his mistake of fact was excusable.  In *Miguel*, the court also held that an officer made a mistake
20 of fact when he stopped a vehicle in the erroneous belief that its registration was expired.  The officer's
21 mistake did not arise from any misunderstanding of the requirements of Arizona's motor vehicle
22 registration law, but rather from incorrect factual information provided to him by the DMV computer
23 which indicated that the vehicle registration had expired.
24         In *United States v. Mariscal*, 285 F.3d 1127, (9th Cir. 2002), the police were conducting
25 surveillance on a residence and a vehicle parked in front of that residence.  After the vehicle left the
26 residence, a police officer, who was parked at an intersection, observed the vehicle make a right turn
27 without signaling.  The officer stopped the vehicle for failing to make the required turn signal.  In
28 discussing *Twilley* and *King,* the court reiterated that an officer's decision to stop and detain a person

1  must be based on a correct understanding of the law. The court also stated:

> That does not mean that the officer must have a precise appreciation for the niceties of the law. If the facts are sufficient to lead an officer to reasonably believe that there was a violation, that will suffice, even if the officer is not certain about exactly what it takes to constitute a violation. *See* [*United States v. Wallace*, 213 F.3d 1216, 1220-21 (9th Cir. 2000)](where front windows could be tinted to a certain extent, but officer thought they could not be tinted at all, he had probable cause to stop a vehicle whose windows were tinted to the point that an officer who really knew the law would believe them to be excessively tinted) . . . .

*Mariscal*, 285 F.3d at 1130.

*Mariscal* stated that "[t]he case at hand is somewhat different from those which have come before because it is not entirely clear that Officer Garrett made a mistake about the law of Arizona, but as far as the record shows, it is clear that if he did understand the law, the facts known to him could not justify a traffic stop." *Id.* at 1131. The court explained that the statute provided that a "'[a] person shall not so turn any vehicle without giving an appropriate signal in the manner provided by this article in the event any other traffic may be affected by the movement.'" *Id.* No evidence was presented during the suppression hearing that any other moving vehicle was in the vicinity when defendant's vehicle made the right turn. The court rejected the district court's attempt to take judicial notice that the vehicle turned at a busy intersection or the government's argument that the police officer's parked vehicle was other traffic that was somehow affected by the failure to give a turn signal. In holding that the stop violated the Fourth Amendment, the court stated that an officer's suspicions are not reasonable if they are not sufficient to believe that a person has done something illegal. Because the officer had no factual basis to believe that the failure to use a turn signal affected other traffic, the officer did not have reasonable suspicion and the stop violated the Fourth Amendment.

This case is similar to *Mariscal* in that the evidence does not indicate that Officers Bryan or Knickerbocker acted under a mistaken view of the law pertaining to the open container ordinance. Neither officer testified that they detained Defendant in the belief that the ordinance prohibits the possession of an open container of alcoholic beverage in a private parking lot to which the public does not have access. To the contrary, Officer Bryan testified that it is his understanding that the ordinance prohibits a person from having an open container of alcohol in any place where the public has access, whether it be a street, parking lot, alleyway or sidewalk. This understanding is consistent with the

Court's conclusion that the ordinance applies to parking lots on private property so long as they are generally accessible to the public.[2]

Unlike the officer in *Mariscal*, Officers Bryan and Knickerbocker had an objectively reasonable basis to believe that the parking lot in which Defendant was observed with an open can of beer was accessible to the public and was therefore within the scope of the ordinance. This also distinguishes this case factually from *People v. Krohn*, 149 Cal.App.4th 1294, 58 Cal.Rptr.3d 60 (2007), where the police officer could not have reasonably believed the defendant was in a public area. If Officers Bryan and Knickerbocker were incorrect in concluding that the parking lot was a "public" parking lot subject to the open container ordinance, their mistake was one of fact and not law. Accordingly, Defendant's motion to suppress should also be denied on this basis.

> **3.   Government's Argument that the Discovery of the Weapon Was Not Tainted by Any Fourth Amendment Violation in Stopping and Detaining Defendant.**

The Government also argues that even if the police officers lacked lawful grounds to stop and detain Defendant for violating the open container ordinance, the link between that unlawful conduct and the subsequent discovery of the weapon is sufficiently attenuated so as to not require suppression of the evidence. The Government's argument appears to be predicated on the assertion that, absent the open container violation, the officers would still have approached Defendant to conduct a "consensual encounter" to find out why he was on the property. The Government suggests that the weapon would also have been discovered during a consensual encounter. The Court will also address this argument in the event that the Court's other findings and conclusions are overruled.

Law enforcement officers may not stop or detain an individual against his will in the absence of probable cause or reasonable suspicion to believe that he is engaged in criminal activity. Officers may, however, approach an individual and engage or attempt to engage him in consensual questioning or

---

[2] This case is also distinguishable from *United States v. Tyler*, 512 F.3d 405, 408, 410-11 (7th Cir. 2008), cited in Defendant's second supplemental brief. In *Tyler*, the officers stopped defendant for violating the city's open container ordinance after they observed him walking down a public street with an open bottle of beer. The city ordinance, however, only prohibited possession of an open container of alcoholic beverage in "any park or park street." Because the ordinance did not apply to public streets, the Seventh Circuit held that the officers committed a mistake of law which rendered the stop unlawful.

conversation. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1324 (1983). An individual who is approached by a police officers is, however, free to disregard or reject an officer's invitation to speak with him and go about his business. *Id.* Although it is probably true that many people will at least briefly stop and speak with a police officer when asked to do so, the Court cannot assume that Defendant Smith would have stopped if the officers had *asked*.

Officers Bryan and Knickerbocker testified that they stopped and detained the Defendant because of the open container violation. There was no suggestion in their testimony that the encounter began as a consensual one. Because there was no "consensual encounter," it is pure speculation as to what would have occurred if there had been one. Additionally, there is no evidence that Officers Bryan or Knickerbocker observed any suspicious bulge on Defendant's person prior to detaining him. To the contrary, Officer Bryan testified that he did not notice the bulge in Defendant's right waist area until 2 or 3 minutes after Defendant was detained. Thus, Defendant might have rejected the officers' request to speak with them and have simply walked away without their observing the suspicious bulge which led to the discovery of the weapon.

If the officers did not have a lawful basis to stop and detain the Defendant, then what occurred thereafter constitutes "the fruits of the poisonous tree" unless there was some intervening event that broke the link between illegal stop and the discovery of the weapon. Officer Bryan observed the bulge in Defendant's waist area while Officer Knickerbocker was questioning him. Based on Defendant's failure to answer Officer Bryan's questions whether he had a weapon and his evasive movements, the officers immediately restrained Defendant, conducted a pat down search and discovered the weapon. There was nothing that broke the link between the initial stop and detention and discovery of the weapon. Accordingly, if the Court had concluded that the officers' stop and detention of Defendant violated the Fourth Amendment, it would also find that such violation required suppression of the evidence pertaining to the firearm.

## **CONCLUSION**

Based on the foregoing, the Court concludes that the police officers had probable cause to stop and detain Defendant Christopher Smith based on his possession of an open container of alcohol in violation of the North Las Vegas Municipal Code. Even if the parking lot in which Defendant was

detained is not a "public" parking lot within the scope of the open container law, the Court would still find that the officers' conduct in stopping and detaining Defendant did not violate the Fourth Amendment because the officer's error was a mistake of fact, and because the officers had a reasonable basis for believing that the parking lot was a publicly accessible parking lot within the scope of the ordinance.  Accordingly,

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant's Motion to Suppress (#16) be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 30th day of April, 2009.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge